J-E01007-21

2021 PA Super 196

| | | |
|---|---|---|
| ROBERT KIMBLE, ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF SHARON KIMBLE AND ROBERT KIMBLE IN HIS OWN RIGHT | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| | : : | No. 617 EDA 2019 |
| LASER SPINE INSTITUTE, LLC, LASER SPINE INSTITUTE PHILADELPHIA, LASER SPINE INSTITUTE OF PENNSYLVANIA, LLC, GLENN RUBENSTEIN, M.D., | : : : : : : : : | |
| APPEAL OF: LASER SPINE INSTITUTE, LLC, | : : | |

Appeal from the Judgment Entered January 17, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 16-00569

| | | |
|---|---|---|
| ROBERT KIMBLE, ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF SHARON KIMBLE AND ROBERT KIMBLE IN HIS OWN RIGHT | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| | : : | No. 618 EDA 2019 |
| LASER SPINE INSTITUTE, LLC, LASER SPINE INSTITUTE PHILADELPHIA, LASER SPINE INSTITUTE OF PENNSYLVANIA, LLC, GLENN RUBENSTEIN, M.D., | : : : : : : : : | |
| APPEAL OF: GLENN RUBENSTEIN, M.D., | : : | |

J-E01007-21

Appeal from the Judgment Entered January 17, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 16-00569

BEFORE:  PANELLA, P.J., BENDER, P.J.E., LAZARUS, J., STABILE, J.,
         DUBOW, J., NICHOLS, J., MURRAY, J., McLAUGHLIN, J., and KING,
         J.

OPINION BY McLAUGHLIN, J.:                    Filed: September 30, 2021

Laser Spine Institute, LLC, Laser Spine Institute Philadelphia, Laser Spine Institute of Pennsylvania, LCC (collectively, "the LSI Defendants") and Glenn Rubenstein, M.D. (together with LSI, "Appellants") appeal from the judgment entered in favor of Robert Kimble in his own right and as administrator and personal representative of the estate of Sharon Kimble. The LSI Defendants contend that the judgment against them is void because the verdict slip used the collective name "Laser Spine Institute," whereas the judgment is against each individual LSI defendant. Appellants also challenge the trial court's denial of their motions for judgment notwithstanding the verdict ("JNOV"), a new trial, or remittitur. We affirm.

Robert and Sharon Kimble married in 2003, divorced in 2012, and remarried later that same year. (As necessary for clarity, we will refer to Robert and Sharon by their first names. "Kimble" standing alone will refer to Robert Kimble.) Sharon suffered from debilitating back pain for which she took numerous pain medications. Although she and her husband lived in Ohio, she sought treatment from the LSI Defendants in Wayne, Pennsylvania, and on January 29, 2014, she underwent outpatient spine surgery at their facility. Dr.

- 2 -

Rubenstein was the anesthesiologist. The surgery began at 7:20 A.M. and ended approximately an hour and 20 minutes later, at approximately 8:40 A.M. Sharon was discharged two hours afterward, at 10:40 A.M. She and her husband then returned to a nearby hotel where they were staying.

At 4:49 P.M. on the day of the surgery, Robert called the hotel's front desk seeking emergency help because Sharon had stopped breathing. Emergency personnel transported Sharon to a local hospital where she was pronounced dead. A toxicology report revealed the presence of multiple opioids and several central nervous system depressants ("CNSDs"), including Dilaudid, Flexeril, OxyContin, and Donnatal. The coroner concluded that the cause of death was the "synergistic" effect of the multiple CNSDs.

Kimble initiated this suit in January of 2016 and raised claims under the Wrongful Death Act and the Survival Act. *See* 42 Pa.C.S.A. §§ 8301, 8302. As the trial neared, Kimble filed a motion *in limine* to preclude "use, reference to, or commentary on" documents relating to what Kimble termed "alleged marital discord." The documents at issue included those relating to proceedings in Ohio pursuant to statutes relating to orders of protection,[1] akin to Protection from Abuse ("PFA") Act orders in Pennsylvania. Others related to Sharon and Robert's 2012 divorce:

---

[1] *See* Ohio Rev. Code § 2919.26. The parties refer to the Ohio order as a "PFA" order. Although Ohio uses different language, we will follow the parties' lead in this regard, in the interest of simplicity.

- Dockets from a Protection from Abuse Action filed by Sharon D. Kimble against Robert E. Kimble. April 20, 2004, in Mentor Municipal Court Ohio. (CRB0400462);

- Protection from Abuse Action filed by Sharon D. Kimble against Robert E. Kimble in the Willoughby Municipal Court, Lake County, Ohio. November 14, 2011. (11CRA03443);

- Judgment of Entry of Divorce, entered in Ohio, on February 23, 2013.

Plaintiff's Motion *in Limine* to Preclude Any Reference to Documents, Statements or Materials Related in Any Way to Alleged Marital Discord, at 2.

Kimble maintained that such evidence was inadmissible under Pa.R.E. 404(b) as improper character evidence. Appellants responded that the documents were relevant to the Wrongful Death claim for loss of society and companionship. N.T., 3/19/18, at 6.[2] The court agreed that questioning Kimble about alleged "discord" was relevant. However, it expressed concern that "it opens up a collateral issue. We will have the trial of the PFAs. We'll have the trial of the divorces in conjunction with this action." ***Id.*** at 18. It thus stated that it was "willing to consider" allowing cross-examination with documents that reflect "some kind of conclusion," such as records of a conviction, as that would be a "matter of record." ***Id.*** at 23.

The court and parties then discussed the admission of such documents. The court stated that Appellants would need a certified record or exemplar in order to admit any of the Ohio records as a public record. ***Id.*** at 24.

_____

[2] At argument, Appellants also claimed it was relevant to their claim that Sharon died by suffocation. N.T., 3/19/18, at 6. This argument is not raised on appeal.

THE COURT: . . . . Now, if he denies it, how do you bring that in?

[Appellant's counsel]: I show him the document.

THE COURT: And if he says - -

[Appellant's counsel]: Signed by the judge. It's a matter of record.

THE COURT: Yeah, yeah, but there's a different way to do that. I mean, people deny stuff here on the stand all the time and then they bring up the Clerk of Court with the file and say this is it.

[Appellants' counsel]: Well, this is a - - I think under the Rules of Evidence it's a public record. I can't bring the clerk in from Ohio or the judge in from Ohio.

THE COURT: But you get a, I forget what they call it, an exemplar or you get a certified document from the court that this is it. This is what it is.

*Id.* at 23-24.

The court pointed out that the 2011 PFA did not include factual findings by a court and the documents were unclear as to the disposition of the action. *Id.* at 17-18, 30-34. Regarding the 2011 arrest, the court concluded:

This is certainly a sufficient basis to ask him the question. But it appears that [Appellants are] stuck with his answer, because he has nothing definitive that shows that a final finding from any court as to what the ultimate resolution was. If he has that, that's a smoking gun if he disagrees with it. It certainly is a sufficient basis to ask a question, but you're stuck with his answer.

*Id.* at 35.

Regarding the divorce decree, which states the court granted the divorce based on gross neglect and extreme cruelty, the trial court concluded it was relevant but the decree itself could only be admitted if properly authenticated:

- 5 -

> You have got bookends[3] with a whole lot of smoke in between. And that smoke I don't want coming in because they cannot be established. It's too collateral. Too prejudicial and too collateral. We'll wind up with a trial about something else. But, again, unless you have the documents to properly introduced, . . . you're stuck with his answer.

*Id.* at 47-78.

At the jury trial, before Appellants cross-examined Kimble, the parties and court again discussed the PFA. The court reiterated that Appellants could ask Kimble about it but were "limited to his answers, unless you can establish something." N.T., 3/20/18, at 63. During the cross-examination, Kimble agreed Sharon had obtained a PFA against him in 2011 and admitted that they had divorced in early 2012 and subsequently remarried. *Id.* at 68-78. When asked Sharon's reasons for seeking the divorce, Robert answered that he did not know. *Id.*

Kimble submitted a proposed verdict slip identifying the defendants as "Glen Rubenstein, M.D." and "Laser Spine Institute." LSI and Dr. Rubenstein jointly proposed a verdict slip that likewise referred to the defendants as "Glen Rubenstein, M.D." and "Laser Spine Institute." The parties ultimately agreed to a verdict slip that used that nomenclature. *See* N.T., 3/28/18, at 2. Throughout trial, the parties referred to all of the LSI Defendants collectively as either the "Laser Spine Institute" or "LSI." The LSI Defendants at no time objected that doing so was improper.

---

[3] The court also ruled the 2004 conviction was admissible. Appellants did not question Kimble about this conviction, and they do not raise any issue regarding it on appeal.

- 6 -

Following deliberations, the jury returned a verdict in favor of Kimble and awarded $10 million in Wrongful Death Act damages and $10 million in Survival Act damages, for a total of $20 million. It apportioned liability between "Laser Spine Institute" and Dr. Rubenstein—65% and 35%, respectively.

Appellants filed timely post-trial motions, alternatively seeking on various grounds JNOV, a new trial, or remittitur. Kimble did not oppose Appellants' request for JNOV as to the Survival Act award. The trial court granted that relief, effectively striking the $10 million Survival Act award. However, it denied Appellants' remaining post-trial motions, including the request for JNOV or remittitur as to the $10 million Wrongful Death Act award.

Kimble then moved for delay damages. In their response to the motion, the LSI Defendants asserted that the jury verdict was not against all of the LSI Defendants collectively but instead against "Laser Spine Institute" alone. The court awarded $500,273.97 in delay damages, and Kimble filed a praecipe to enter judgment. The LSI Defendants moved to strike the praecipe, or any judgment entered pursuant to it. They renewed their assertion that "the jury did not enter a verdict against them" but rather against "Laser Spine Institute," which they termed "a trade name only."[4] They contended that there was in fact no evidence at trial against any of the LSI Defendants and that

---

[4] Laser Spine Institute Philadelphia, Laser Spine Institute of Pennsylvania, LLC, and Laser Spine Institute, LLC's Emergency Motion to Strike Praecipe to Enter Judgment or Judgment at 2, 4.

Kimble's praecipe was an attempt to amend the verdict. They thus maintained that any judgment entered on the verdict and against them would violate due process. The trial court did not rule on the motion because by the time it came before the court, Appellants had filed this appeal.

On appeal, Dr. Rubenstein raises four issues:

I. Whether judgment n.o.v. or a new trial is required because Mr. Kimble failed to establish a prima facie case of medical malpractice[;]

II. Whether a new trial is required because defense counsel was improperly prohibited from establishing Mr. Kimble's well-documented history of extreme domestic violence, which was highly prejudicial because Mr. Kimble's Wrongful Death claim depended entirely on harm to the marital relationship, he portrayed himself as a "great guy" who loved and missed his wife, and he then feigned complete ignorance of the domestic violence[;]

III. Whether a new trial is required because the jury improperly apportioned liability to Dr. Rubenstein and [LSI] as joint tortfeasors after the trial court instructed the jury that [LSI] could be found only vicariously liable?

IV. Whether Judgment N.O.V., a new trial, or a substantial remittitur is required because the jury's $10 million Wrongful Death award was unsupported by sufficient evidence, contrary to the weight of the evidence, and manifestly excessive?

Dr. Rubenstein's Substituted Brief at 5.

LSI presents four questions that are essentially the same as Dr. Rubenstein's issues, to which they add a fifth issue, which is listed first:

1. Whether the judgment against [LSI] is void where [they] were not listed on the jury's verdict slip, were not found liable by the jury and never agreed that a verdict against "Laser Spine Institute" could become a judgment against them?

2. Whether [LSI] are entitled to JNOV or a new trial where [Kimble] failed to present expert testimony establishing a breach of an objective standard of care, causation and damages under any of [Kimble's] theories, and, thus, failed to prove a claim of negligence against any Defendant?

3. Whether [LSI] are entitled to JNOV or a new trial, where [Kimble] failed to prove his claim of direct or corporate liability and there was no justification for the jury's 65% apportionment of liability for a $20,000,000 verdict against "Laser Spine Institute?"

4. Whether [LSI] are entitled to a new trial after the trial court erroneously precluded Defendants from cross-examining [Kimble] about his extensive domestic abuse in circumstances where: (i) the trial court previously ruled that Defendants would be permitted to question [Kimble] and use this evidence during [Kimble's] cross-examination; (ii) the questions were proper and the documents were properly authenticated, not hearsay and directly relevant to [Kimble's] claim for "loss of companionship," which was the sole basis for [Kimble's] Wrongful Death damages claim; and (iii) Defendants were severely prejudiced by the ruling?

5. Whether [LSI] are entitled to JNOV, a new trial or remittitur where evidence of [Kimble's] history of domestic abuse undermined Plaintiff's claim for loss of companionship, the $10,000,000 Wrongful Death Act award lacked sufficient evidentiary support, was against the weight of the evidence and was clearly excessive?

LSI's Substituted Brief at 4-5 (suggested answers omitted).

We will first address the LSI Defendants' claim that the judgment against them is void. The LSI Defendants argued below (and in their Pa.R.A.P. 1925(b) Statement) that the trial court should have stricken the judgment against them in their corporate names because the verdict slip was against "Laser Spine Institute." After the trial court pointed out that they had sought

to raise an issue that they had not raised in a timely fashion during trial,[5] they modified their argument to claim that the difference between the verdict slip and the judgment rendered the judgment void. They tellingly cite no authority to support their claim of voidness. Kimble counters that we should turn for guidance to *Heldring v. Lundy Beldecos & Milby, P.C.*, 151 A.3d 634 (Pa.Super. 2016).

*Heldring* was a legal malpractice case and in the underlying suit, plaintiff's counsel named one defendant in the caption as "Grasso Holdings." Counsel obtained a judgment, and after entry of judgment, realized that "Grasso Holdings" was a mere trade name. He then moved to have the judgment apply to a number of affiliated entities in their corporate names. The trial court denied the motion because doing so would require it to "reexamine the evidence and further reconsider the judgment entered." *Id.* at 639 (citation omitted). We found the allegations – that the attorney had negligently sued a mere trade name and obtained an uncollectible judgment – sufficient to state a legal malpractice claim. *Id.* at 643.

This case presents essentially the reverse situation as the underlying case in *Heldring*. Here, Kimble sued the LSI Defendants in their separate corporate names, they appeared and defended on the merits, and when Kimble prevailed, he praeciped judgment against them in each of their separate corporate names – the same names under which he sued them.

---

[5] Trial Court Opinion, filed 7/22/19, at 1 (unpaginated).

Unlike the plaintiff's counsel in the underlying suit in **Heldring**, Kimble did not sue them in one name and then, after all was said and done, attempt to apply the judgment to a different name. The LSI Defendants admit this much. Rather, their quibble is with the verdict slip's use of their trade name, which they insist renders the judgment void.

The use of the trade name on the verdict slip is not a proper basis on which to strike the judgment as void. At best, the verdict slip afforded the LSI Defendants an opportunity to make an objection and if unsuccessful, preserve their issue for appeal. Instead, they agreed to being referred to on the verdict slip as "Laser Spine Institute."

Immediately prior to closing arguments, Appellants' counsel explicitly agreed to the slip given to the jury:

> THE COURT: Here are the verdict slips.
>
> (A discussion was held off the record.)
>
> [Kimble's Counsel]: Thank you, your Honor.
>
> [Appellants' Counsel]: Fine, your Honor.
>
> [Kimble's Counsel]: The jury verdict slip is acceptable to the plaintiffs.
>
> THE COURT: Good.

N.T., 3/28/18, at 2.

The record reflects that Appellants agreed to the verdict slip at trial. In so doing, they waived any challenge to the manner in which the slip identified them. **See Commonwealth v. Nellom**, 234 A.3d 695, 704 (Pa.Super. 2020)

- 11 -

(holding failure to object to language of verdict slip at trial waived appellate challenge), *appeal denied*, No. 551 MAL 2020, 2021 WL 1379055 (Pa. Apr. 13, 2021)[6]; **Stapas v. Giant Eagle, Inc.**, 198 A.3d 1033, 1041 (Pa. 2018) (concluding that a claim that a verdict slip was deficient must be raised before the jury returns its verdict, as otherwise it would deprive a trial court of the opportunity of correcting the deficiency).

Moreover, even if the LSI Defendants had objected, any claim predicated on an alleged a mismatch between the LSI Defendants' names and the verdict slip would have been disingenuous. The record is replete with instances in which both sides referred to the LSI Defendants in the collective as "Laser Spine Institute" or "LSI." As the trial court recounted, the LSI Defendants' trial counsel "repetitively and collectively referred to [all three of the LSI Defendants] throughout trial and post-trial as 'Laser Spine institute' or 'LSI.'" Trial Court Order, 2/22/19, at 1 n.1. The court further pointed out that "[d]efense trial counsel sought nonsuit on behalf of 'Laser Spine Institute' at the close of Plaintiffs' case and DID NOT seek a directed verdict on behalf of each individual corporate defendant prior to jury discharge because of any now claimed misnomer issue." **Id.** No one observing the proceedings could reasonably have been confused. More to the point, the judgment is not void. The LSI Defendants' first issue lacks merit.

---

[6] **See also Commonwealth v. duPont**, 730 A.2d 970, 984-85 (Pa.Super. 1999).

We now turn to Appellants' remaining issues, which we will address in the order in which the LSI Defendants present them, the next being the claim that the trial court erred in failing to grant Appellants' motion for JNOV. They contend that Kimble did not establish a *prima facie* case of negligence against Dr. Rubenstein because Kimble failed to present evidence of the applicable standard of care. Appellants assert that Kimble was consequently unable to establish that Dr. Rubenstein breached a standard of care that caused Sharon's death. The LSI Defendants further argue they are entitled to JNOV because Kimble did not prove that they were vicariously liable for Dr. Rubenstein's conduct as Dr. Rubenstein's employer. The trial court concluded Appellants waived these claims by failing to raise them below.

A party moving for JNOV must have preserved during trial the claim on which it predicates its JNOV motion. Pa.R.C.P. 227.1(b). There are two ways to do so. A party may file a motion for directed verdict during trial referencing a particular point of contention, or the party may request a binding jury instruction regarding the claim. **See Corvin v. Tihansky**, 184 A.3d 986, 990 (Pa.Super. 2018); **Hayes v. Donohue Designer Kitchen, Inc.**, 818 A.2d 1287, 1291 n.4 (Pa.Super. 2003). Appellants claim to have preserved their right to seek JNOV by both means: first, by moving for nonsuit at the close of Kimble's case-in-chief, and second, by requesting three binding jury instructions. We disagree.

The only grounds Appellants offered during trial for their motion for nonsuit was that Kimble had allegedly failed to present evidence that the LSI

Defendants had been negligent or that Dr. Rubenstein was an agent or employee.

> Your Honor, I ask for a nonsuit as to the Laser Spine Institute. I don't believe there has been any testimony that Laser Spine in and of itself deviated from their standard of care and caused the patient's death. There has been no testimony concerning agency or employment status of Dr. Rubenstein at the time of his treatment of this patient.

*See* N.T., 3/26/18, at 53-54. The court denied the nonsuit and in any event, the LSI Defendants ultimately conceded that Dr. Rubenstein was an employee.

*See* N.T., 3/28/18, at 52, 65. Significantly, Appellants did not seek nonsuit based on their present contention that Kimble failed to establish that Dr. Rubenstein breached the standard of care. The nonsuit motion did not preserve the instant issue.

Nor did their proposed binding instructions. Before trial, Appellants filed proposed points for charge that included three instructions stating that the jury's verdict "must be for the Defendants . . . and against the Plaintiffs":

> 1. Under the law and all evidence that you have heard, I charge you that your verdict must be for the Defendants, Laser Spine Institute of Philadelphia, Laser Spine Institute of Pennsylvania, Laser Spine Institute LLC and Glen Rubenstein, M.D., and against the Plaintiffs[.]
>
> 2. Under all of the pleadings and all of the evidence in this case, your verdict must be for the Defendants, Laser Spine Institute of Philadelphia, Laser Spine Institute of Pennsylvania, Laser Spine Institute LLC and Glen Rubenstein, M.D., and against the Plaintiffs[.]
>
> 3. Under the credible evidence of this case, I charge you that as a matter of law, your verdict must be for the Defendants, Laser Spine Institute of Philadelphia, Laser Spine Institute of

> Pennsylvania, Laser Spine Institute LLC and Glen Rubenstein, M.D., and against the Plaintiffs.

Appellants' Request for Binding Instructions, 3/16/18, at 1-3.

The proposed instructions were highly general and contained no reference to Appellants' current claim that Kimble failed to establish that Dr. Rubenstein breached any applicable standard of care. At the charging conference, when the court turned to Appellants' proposed instructions, Kimble's counsel said that "most of them are standard," and the trial judge replied, "If they're not standard, I usually don't give them." N.T., 3/27/18 at 40. Appellants did not obtain a specific ruling on any of the three proposed instructions above.

Even assuming that the court's statement that it does not usually give non-standard charges constituted a refusal to give any one of the three charges,[7] none of Appellants' proposed charges put before the court the issue they now want to argue: Kimble's alleged failure to present evidence that Dr. Rubenstein breached the applicable standard of care. Appellants' proposed jury instructions did not preserve their right to seek JNOV on that basis. This issue also fails.

In the next issue, Appellants argue that they are entitled to a new trial because the jury was improperly allowed to apportion liability. Appellants

_____

[7] **But see Jones v. Ott**, 191 A.3d 782, 790 (Pa. 2018) (plurality) ("Without an on-the-record ruling upon a proposed point for charge, an appellate court cannot know whether the trial court denied the point for charge, whether counsel withdrew the point for charge, or whether the parties agreed upon a compromise charge.").

assert that because Kimble's claim against the LSI Defendants was for vicarious liability, not joint liability, the LSI Defendants could not be 65% liable for Sharon's death. Appellants claim that the trial court erred by allowing the jury to apportion liability on the verdict slip, but insist that they are not challenging the wording of the verdict slip. *See* Appellants' Brief, at 42-43.

We disagree that Appellants are not challenging the verdict slip. The whole point of their claim is that the jury should not have apportioned liability. The jury did so because the verdict slip directed it to do so. The styling of the verdict slip is an unavoidable component of their claim. Yet Appellants waived any challenge to the verdict slip by agreeing to it. Consequently, Appellants cannot challenge the propriety of the verdict slip on appeal. *See Oxford Presbyterian Church v. Weil-McLain Co., Inc.*, 815 A.2d 1094, 1105 (Pa. Super. 2003) (holding that the appellant's failure to object to the verdict slip at trial waived a challenge to it on appeal).

In any event, even if Appellants had not waived this issue, they would not be entitled to relief. It is true the verdict slip should not have asked the jury to apportion liability. Vicarious liability is a doctrine of imputed liability that permits a successful plaintiff to collect from an agent's principal a judgment based on the agent's tortious conduct:

> The rules of vicarious liability respond to a specific need in the law of tort: how to fully compensate an injury caused by the act of a single tortfeasor. Upon a showing of agency, vicarious liability increases the likelihood that an injury will be compensated, by providing two funds from which a plaintiff may recover. If the ultimately responsible agent is unavailable or lacks the ability to pay, the innocent victim has recourse against the principal. If the

- 16 -

agent is available or has means to pay, invocation of the doctrine is unnecessary because the injured party has a fund from which to recover.

*Keffer v. Bob Nolan's Auto Serv., Inc.*, 59 A.3d 621, 637 (Pa.Super. 2012) (citation omitted). Vicarious liability as a "general rule" entails liability for 100% of the damages. *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 489 (Pa. 2009).[8]

We thus agree that the jury should not have been allowed to apportion liability. Rather, based on the trial court's vicarious liability instruction, the LSI Defendants' admission that Dr. Rubenstein was acting as their agent, and the jury's finding that Dr. Rubenstein was negligent, the LSI Defendants are subject to 100% of the liability for Sharon's death. *See Keffer*, 59 A.3d at 637. Nonetheless, Appellants are not entitled to relief. Regardless of the mistake on verdict slip, LSI was 100% liable for Sharon's death. Appellants' general, unsupported assertions that they were prejudiced by increased damages that resulted from the trial court permitting the jury to apportion liability between LSI and Dr. Rubenstein on the verdict slip are unavailing. Indeed, Appellants cite no authority that supports this proposition. Thus, this issue also lacks merit.

Next, Appellants challenge the trial court's rulings on the divorce decree and PFA order. The LSI Defendants maintain they are due a new trial because

---

[8] *Cf. Cont'l Cas. Co. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 390 F. Supp. 3d 614, 622 (E.D. Pa. 2019) (noting counsel's statement that under Pennsylvania law employer "had vicarious liability for 100% of any verdict").

the trial court precluded them from cross-examining Kimble with the divorce decree and the PFA order. They argue the court should not have sustained an objection to questions they characterize as asking Kimble's own memory of events that led to the entry of the PFA order and the divorce decree. They also argue the court should not have sustained Kimble's objections to their using the Ohio divorce decree and PFA during cross-examination. They maintain that both satisfied the Pennsylvania Uniform Interstate and Internal Procedure Act[9] ("UIIPA"), were self-authenticating, and were not objectionable for being copies rather than originals. They also contend they were relevant and not hearsay, and their exclusion caused them prejudice.

Dr. Rubenstein likewise argues that the trial court improperly restricted the questioning of Kimble about the reasons for the PFA and divorce and should not have barred them from using the documents in cross-examination. He contends they were relevant, non-hearsay, and properly authenticated. He further claims that the issues were not collateral but rather highly relevant to the question of damages.

Kimble responds that the trial court properly restricted questioning on the PFA and divorce to avoid the trial from becoming enmeshed in collateral issues. He also contends the documents were inadmissible under the UIIPA. He further maintains that in any event, Appellants were able to put before the jury "the core and more" of the history of alleged marital discord. Kimble's Br.

---

[9] *See* 42 Pa.C.S. § 5328(a).

- 18 -

at 36. He points out that Appellants obtained Kimble's own admissions that Sharon had obtained the PFA against him and that it was still in effect, and that she had gotten not only a divorce from him but also property distribution and alimony awards. He also points out that the court allowed them to introduce a 2004 domestic violence conviction and question other witnesses about marital discord.

The admissibility of evidence is within the sound discretion of the trial court, and we will not overturn its decisions in this regard absent an abuse of discretion or misapplication of law. **See Lykes v. Yates**, 77 A.3d 27, 32 (Pa. Super. 2013). We also do not reverse such a ruling unless the objecting party sustained prejudice. **Id**. "An abuse of discretion is not merely an error of judgment. It requires a showing of manifest unreasonableness, partiality, ill-will, or such lack of support as to be clearly erroneous. Under this standard, the party challenging the trial court's discretion on appeal bears a heavy burden." **SLT Holdings, LLC v. Mitch-Well Energy, Inc.**, 217 A.3d 1248, 1251 (Pa.Super. 2019).

The trial court agreed the PFA order and divorce were relevant but refused admission of the documents they offered because Appellants failed to authenticate them,[10] and disallowed certain questioning to avoid descent into

---

[10] Dr. Rubenstein's claim that Kimble waived any objection to authentication under the UIIPA by making no such objection at trial and by producing and identifying the documents himself is meritless. Dr. Rubenstein's Br. at 49. The authentication issue had come up during the conference at the start of trial,
*(Footnote Continued Next Page)*

collateral factual disputes. Appellants contend the documents were properly authenticated. We disagree. Pennsylvania Rule of Evidence 901(a) provides that "[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a).

Some types of documents do not require extrinsic evidence of authenticity because they are self-authenticating. Pa.R.E. 902. Self-authenticating documents include "domestic public documents that are not sealed but are signed and certified." Pa.R.E. 902(2). Such documents are self-authenticating if they meet two requirements. First, they must "bear[] the signature of an officer or employee of [an enumerated entity, including any state]." *Id.* Second, "another public officer who has a seal and official duties within that same entity certifies under seal—or its equivalent—that the signer has the official capacity and that the signature is genuine." *Id.*

The UIIPA provides another means for authenticating domestic records. It requires the proponent of the evidence to present "an official publication thereof" or "a copy attested by the officer having the legal custody of the

_____

and when Kimble objected to the documents during trial, he did not state a basis. N.T., 3/22/18, at 72, 76. The court thus reasonably understood his objection to include authentication. The claim that Kimble in effect authenticated the divorce decree also fails. Dr. Rubenstein bases his argument on one instance in which Kimble handed to the court the divorce court's opinion, not the decree, and another in which he merely referred to the decree.

record, or by his deputy, and accompanied by a certificate that the officer has the custody." 42 Pa.C.S.A. § 5328(a).[11]

The documents Appellants offered at trial lacked the requisite certifications. For the PFA, they offered a copy of the docket entries containing the text of the order. It bears a single certification of a deputy clerk. The certification reads, "I hereby certify, [*sic*] that the foregoing is a complete transcript of the proceedings, the docket entries containing a copy of the complaint, the judgment, and an itemized account of the costs that have accrued in the case. Given under my hand, this 30th day of November, 2011." R.R. 1627a.[12] Following that text is the signature of the deputy clerk. After that there appears the signature of the chief deputy clerk. R.R. 1628a. That signature is not accompanied by any additional text.

---

[11] "(a) Domestic record.--An official record kept within the United States, or any state, district, commonwealth, territory, insular possession thereof, or the Panama Canal Zone, the Trust Territory of the Pacific Islands, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied by a certificate that the officer has the custody. The certificate may be made by a judge of a court of record having jurisdiction in the governmental unit in which the record is kept, authenticated by the seal of the court, or by any public officer having a seal of office and having official duties in the governmental unit in which the record is kept, authenticated by the seal of his office." 42 Pa.C.S. § 5328(a).

[12] The certified record does not contain the copies of the PFA and divorce decree that Appellants referenced at trial. For purposes of this appeal, we will review the documents contained in the reproduced record. **See Commonwealth v. Holston**, 211 A.3d 1264, 1276 (Pa.Super. 2019) (noting "where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it").

This is insufficient to meet Rule 902(2). There is no certification under seal or its equivalent that either "signer has the official capacity" or that either "signature is genuine." Nor does it satisfy the UIIPA, as the certification does not state that the clerk has possession of the original. *See Domus, Inc. v. Signature Bldg. Sys. of PA, LLC*, 252 A.3d 628, 631 (Pa. 2021) ("Pennsylvania law mandates a certificate from a judge or other officer in the originating jurisdiction as to custody of the record.").[13] The copy of the divorce decree that Appellants offered is likewise lacking. It has no accompanying certification at all, much less one that meets either Rule 902 or the UIIPA. Because the court found the documents inadmissible due to lack of authentication, Appellants' relevance and hearsay arguments are beside the point.

Appellants also challenge the limitations on their cross-examination of Kimble. The scope of cross-examination is within the sound discretion of the trial court, and we reverse only for an abuse of discretion. *See Nazarak v. Waite*, 216 A.3d 1093, 1111 (Pa. Super. 2019). In exercising this discretion, the trial court may limit cross-examination due to concerns that the matter is collateral, would likely confuse or mislead the jury, or would waste time. *See Commonwealth v. Largaespada*, 184 A.3d 1002, 1009 (Pa. Super. 2018);

---

[13] *See also Medina & Medina, Inc. v. Gurrentz Int'l Corp.*, 450 A.2d 108, 110 (Pa.Super. 1982) (finding Puerto Rican docket entries properly authenticated under the UIIPA where they were accompanied by a certificate signed by an assistant clerk stating they were authentic, bore seal of court, and stated clerk had custody of original).

*Gen. Equip. Mfrs. v. Westfield Ins. Co.*, 635 A.2d 173, 182 (Pa.Super. 1993).

Here, Appellants were able to elicit Kimble's admissions that his wife had obtained a PFA against him and had divorced him. However, when Appellants attempted to delve into underlying factual questions – such as asking Kimble about events that led his wife to seek the PFA and divorce – the trial court disallowed the questioning. At the same time, it allowed Appellants to obtain Kimble's testimony that he did not know or could not remember seemingly important details.

> Q. Well, let me ask it this way. Was there not at the time of your wife's death, in fact, a protection from abuse order still in effect against you?
>
> [Kimble's Counsel]: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: Yes.
>
> * * *
>
> Q. What do you remember about what happened? Tell us about the events that led to your former wife, Ms. Kimble, filing and requesting that the court enter an order against you protecting her from abuse.
>
> [Kimble's Counsel]: Objection.
>
> THE COURT: Sustained.
>
> * * *
>
> Q. And as I recall the events was [*sic*] she had recently been hospitalized; is that correct?
>
> [Kimble's Counsel]: Objection.
>
> THE COURT: Sustained.

Q. Okay. Give us your best recollection either today or what you told me at your deposition about the events surrounding that, sir?

[Kimble's Counsel]: Objection again.

THE COURT: Sustained.

* * *

Q. Okay. And the basis for her filing for divorce against you was what, sir?

[Kimble's Counsel]: Objection.

THE COURT: Sustained.

* * *

Q. Okay. And you do not remember what the basis for the entry of this order was?

[Kimble's Counsel]: Objection.

THE WITNESS: No, I don't. I can't –

THE COURT: Hold on. Overruled.

[By Appellants' counsel]:

Q. Do you know the basis for the entry of this order against you, sir?

[Kimble's Counsel]: Objection.

THE COURT: Overruled.

THE WITNESS: I don't understand what you're trying to say.

* * *

Q. Okay. And do you recall when you learned that you read the [divorce] decree?

A. I don't know if I did or not.

Q. Okay.

[Appellants' Counsel]: Well, if I – may I refer to it now, you Honor.

- 24 -

[Kimble's Counsel]: No. Objection.

THE COURT: You going to rule and then object?

[Kimble's Counsel]: Objection, your Honor.

THE COURT: Sustained.

BY [Appellants' Counsel]:

Q. If I suggested to you that there was a finding that the divorce was granted on certain grounds of gross neglect and extreme cruelty, would you have any reason to disagree with that, sir?

[Kimble's Counsel]: Objection.

THE WITNESS: Was I --

THE COURT: Sustained.

BY [Appellants' Counsel]:

Q. You're telling us, sir, you have absolutely no understanding of why that divorce decree was entered against you?

A. No, I don't, sir.

[Robert's Counsel]: Your Honor, again, objection. It's like beating a dead horse here. Same question.

THE COURT: No it is not. Overruled.

N.T., 3/22/18/ at 68-77.

The trial court trod a narrow path. It carefully limited questioning in order to avoid having "the trial of the PFAs" and "the trial of the divorces in conjunction with this action." N.T., 3/19/18, at 18. Nonetheless, it allowed questions putting into evidence the facts that Sharon had obtained the PFA and the divorce. It also allowed Appellants to obtain Kimble's claims that he either did not know or did not remember things that arguably would matter

to him. It thus afforded Appellants a basis to challenge Kimble's credibility and undermine his testimony in other areas, including the nature of their relationship. The trial court explained that although the matters had some relevance, if Appellants were allowed to cross Kimble on background facts about the PFA order and divorce, Kimble would "almost be obligated" to come back with witnesses to testify that it was "no more than what a lot of people go through, they're just a little more volatile." N.T., 3/19/18, at 9.

Under these circumstances, we conclude that the court was justifiably concerned about such questioning leading to a re-litigation of the PFA order and the divorce. The contention that Appellants were merely asking Kimble's own recollection of events misses the point. Under the instant circumstances, the court properly limited Appellants' cross-examination to allow for the admission of relevant information without allowing the trial to become mired in collateral matters. **See Gen. Equip.**, 635 A.2d at 182; **Nazarak**, 216 A.3d at 1111.

Appellants further claim that the trial court ought to have allowed them to refresh Kimble's recollection with the divorce decree is equally meritless. In the only place in the record they cite, Kimble testified he did not know the reason for his wife's seeking the divorce, not that he did not remember.[14] **See**

---

[14] **See** LSI Defs.' Br. at 47 (citing R.R. 614a). Dr. Rubenstein argues the court should have allowed him to use the PFA order to refresh Kimble's memory, but he cites no place in the record where Appellants attempted to do so, and we find none. **See** Dr. Rubenstein's Br. at 52.

Pa.R.E. 612(a); **Commonwealth v. Payne**, 317 A.2d 208, 210 (Pa. 1974).[15] Appellants' fourth issue warrants no relief.

Finally, Appellants argue that the $10 million wrongful death award was so excessive that the trial court erred in failing to either order a new trial or grant remittitur. The LSI Defendants argue the $10 million in Wrongful Death damages for loss of companionship was excessive, in view of the evidence of domestic discord. They point out that there was no evidence of lost services or of medical or funeral expenses. They further argue that the evidence of the divorce and the PFA "undermines completely" the claim for loss of companionship. LSI Defs.' Br. at 59.

They argue in the alternative that the Wrongful Death award should be vacated or remitted because it shocks the conscience. They claim that the verdict is excessive in view of the absence of evidence of the pecuniary value of lost services, and lower awards in other cases. They cite the Pennsylvania Supreme Court's recent decision in **McMichael v. McMichael**, 241 A.3d 582 (Pa. 2020), to argue that what they term "the virtually non-existent 'companionship' evidence" here was insufficient to support the award. LSI Defs' Supp. Br. at 8.

Dr. Rubenstein similarly maintains that he is entitled to JNOV, a new trial, or remittitur because the award is unsupported by sufficient evidence,

---

[15] **See also Commonwealth v. Montgomery**, 687 A.2d 1131, 1137 (Pa.Super. 1996) (setting forth foundational showing before party may attempt to refresh recollection); Leonard Packel and Anne Bowen Poulin, 1 West's Pa. Prac., Evidence § 612-1 (4th ed.)

contrary to the weight of the evidence, and manifestly excessive. He maintains that the Wrongful Death claim depended on the pecuniary value of lost services, as the trial court instructed the jury. Yet, according to Dr. Rubenstein, "the record contains no evidence from which a jury could have valued Mrs. Kimble's lost services, much less valued them at $10 million." Dr. Rubenstein's Br. at 58.

Dr. Rubenstein then characterizes the trial court's analysis as improperly justifying the award under the Wrongful Death Act as damages for grief. He criticizes the trial court for stating that the determination is left to "the wisdom of a jury," and for posing the rhetorical question, "How much is a marital relationship worth to a surviving spouse?" *Id.* at 60. Dr. Rubenstein contends that those statements reveal the trial court's abdication of its responsibility to assess the Wrongful Death award. He argues that the court ought to have compared the award here to verdicts in other Wrongful Death cases, contending that this Court has "recognized" the propriety of doing so to determine excessiveness and whether to grant remittitur. *Id.* at 61 (citing ***Tong-Summerford v. Abington Mem. Hosp.***, 190 A.3d 631, 652 (Pa.Super. 2018)). Finally, he flatly declares, without analysis, that the verdict is against the weight of the evidence.

Kimble responds that the trial court did not abuse its discretion in rejecting these claims. He disputes the characterization of the trial court's analysis as an abdication of responsibility. He points out that the judge in fact found the evidence supported the award before making the pronouncements

Appellants quote. Kimble also challenges the making of comparisons to verdicts in other cases as inherently inapt, as "each case is unique and dependent on its own special circumstances." Kimble's Br. at 58 (quoting *Hyrcza v. W. Penn Allegheny Health Sys.*, 978 A.2d 961, 979 (Pa.Super. 2009)). He maintains that to the extent such comparisons are appropriate, the differences between the awards in the cases Appellants cite and the award here are justifiable because of the differences in the relevant facts. He contends that such distinctions merely serve to support the instant award. He adds that *McMichael* is inapposite, as there the Supreme Court reversed a verdict of zero dollars as inadequate. He further contends that *McMichael* supports the award here because it reaffirmed precedents undergirding the trial court's ruling.

In evaluating a claim that a verdict is against the weight of the evidence, Pennsylvania courts employ a shocks-the-conscience test. *See Armbruster v. Horowitz*, 813 A.2d 698, 703 (Pa. 2002). The trial court should grant a new trial "only in truly extraordinary circumstances, *i.e.*, 'when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" *Thompson v. City of Phila.*, 493 A.2d 669, 672 (Pa. 1985).

The trial court's authority to override a jury verdict on weight-of-the-evidence grounds is so narrowly circumscribed because questions of weight and credibility are for the factfinder. *See id.* "[A] trial judge cannot grant a

new trial 'because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion.'" ***Armbruster***, 813 A.2d at 703 (Pa. 2002) (internal quotation marks and citation omitted). The court nonetheless has some discretion to grant a new trial where it concludes the verdict is against the weight of the evidence. However, determining whether the verdict was objectively shocking is within the sole discretion of the trial court, and rightly so, as it has had a first-hand view of the evidence.

In contrast, our review is necessarily second-hand. ***See id***. ("Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon the cold record."). As a result, a party who failed to convince the trial judge that the verdict was against the weight of the evidence may obtain relief on appeal only if it shows that the trial court acted capriciously or palpably abused its discretion. ***See id***.

We similarly do not determine in the first instance if a damages award should be reduced. Instead, we review a trial court's ruling on a request for a reduction for abuse of discretion. ***Carlino v. Ethicon, Inc.***, 208 A.3d 92, 118 (Pa.Super. 2019) (citation omitted).[16] The trial court may grant remittitur if "the award of compensatory damages lies beyond 'the uncertain limits of fair and reasonable compensation'" or "the verdict 'so shocks the conscience as to

---

[16] ***See also Botek v. Mine Safety Appliance Corp.***, 611 A.2d 1174, 1176 (Pa. 1992).

suggest that the jury was influenced by partiality, prejudice, mistake, or corruption.'" **Carlino**, 208 A.3d at 118 (quoting **Hammons v. Ethicon, Inc.**, 190 A.3d 1248, 1285-86 (Pa.Super. 2018)). The standard "is highly deferential, because the trial judge serves not as finder of fact but as impartial courtroom authority with obligation to give great respect to the jury's function." **Id.** (citations omitted). "[I]t is our task to determine whether the lower court committed a clear or gross abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur." **Id.** (citations and quotation marks omitted).

The damages at issue here were awarded under the Wrongful Death Act. That act permits a claimant to recover both economic and noneconomic damages, including damages for loss of society and comfort. **See Rettger v. UPMC Shadyside**, 991 A.2d 915, 932 (Pa.Super. 2010). Recovery under the act may also extend to the profound emotional and psychological loss suffered as a result of the death of a family member. **See id.** at 933.

Damages for such intangibles are obviously not susceptible to determination by a mathematical formula. **See Hammons**, 190 A.3d at 1286.[17] Such damages must by their nature be "measured by experience." **Brown v. End Zone, Inc.**, 193 EDA 2020, 2021 WL 2656719, at *8

---

[17] As our Supreme Court explained, "[I]t is immediately apparent that there is no logical or experiential correlation between the monetary value of medical services required to treat a given injury and the quantum of pain and suffering endured as a result of that injury." **Martin v. Soblotney**, 466 A.2d 1022, 1025 (Pa. 1983).

(Pa.Super. filed June 29, 2021) (citation omitted). "For this reason, the law entrusts jurors, as the impartial acting voice of the community, to quantify noneconomic loss and compensation." ***Hammons***, 190 A.3d at 1286 (citing ***Nelson v. Airco Welders Supply***, 107 A.3d 146, 161 (Pa. Super. 2014).

Here, the trial court aptly assessed the ample evidence supporting the jury's award. For example, at trial, Corey Kimble testified to the heavy psychological and emotional toll Sharon's death has taken on his father, Robert Kimble:

> [H]e goes to [her] grave site everyday [*sic*] . . . [Y]ou can see [it] from a mile away . . . It's the most decorated site I've ever seen . . . He has a bench there that he put.  He got a statute of an angel and painted it pink.  Pink was [her] favorite color . . . [A]nd blonde hair.  Sharon had blonde hair. Solid statute, the biggest statue I've ever seen . . . [H]e has . . . a squirrel that visits him that recognizes his car when he pulls into the cemetery . . . [H]e calls him buddy. The squirrel hangs out . . . [H]e has all these memory [sic] he's able to shape around her grave site, and I have never seen anything like it . . .

N.T., 3/22/18, 564-565. He detailed his father's routine of visiting Sharon's grave daily, his meticulously maintenance of the grave, and his daily despondency over Sharon's death. ***Id.***

Robert Kimble also testified, articulating the gravity of his loss and movingly describing his despondency. Robert testified:

> For the first three years[,] I went there every day . . . I'd get off work, I'd set up there for two, three hours at a time . . . [T]his might sound crazy to some people, but her favorite bands were Journey and Fleetwood Mac, so I went out and bought CDs and CD player . . . I'd go up there and

> set there and I'd put in Journey and play the CD and then after that was done I'd put in Fleetwood Mac . . . I'd go up there and rake the leaves, clean up around the headstone and stuff wash it down and wipe it off, wipe it off, make sure it's clean. I like it to look nice up there.

*Id.* at 600-601.

He testified about his overarching loneliness, which led to his need to move in with his elderly mother because he could not bear living alone. *Id.* at 575. He said he even has a portrait of Sharon tattooed on his calf and her initials on his ring finger. *Id.* at 601-602. He also detailed his nostalgic memories of his wife that remain painfully vivid and dear. He said, "We go to visit the grandkids, because she loved the grandkids . . . And then we go over our friends . . . and we jam a little bit and sing and stuff." *Id.* at 603. Robert described how they would sing duets together: "My wife had one heck of a singing voice . . . like Stevie Nicks. And that's just what we love to do." *Id.* Robert also described how much he missed his wife: "I just miss being with her. That was my baby doll. I'm not going to find anybody else like her. And I'm not really interested in trying to find anybody. That was it." *Id.* at 603-604.

Based on the evidence, and our highly deferential standard of review, we conclude that the trial court did not act capriciously or palpably abuse its discretion when determining that the jury's Wrongful Death award was not against the weight of the evidence. *See Armbruster*, 813 A.2d at 703.

*McMichael* is not to the contrary. There, the Pennsylvania Supreme Court remanded for a new trial on a Wrongful Death damages claim where the

jury awarded no damages for a Wrongful Death claim. It concluded that the trial court did not abuse its discretion in denying a new trial based on an award of zero dollars in economic damages, as the record lacked evidence regarding the value of lost services. *McMichael*, 241 A.3d at 593. However, it concluded that the award of no damages for "non-economic wrongful death damages bears no reasonable relation to the proffered evidence of loss suffered by" the decedent's wife. *Id.* at 594. The Court noted the wife testified that, among other things, she and her husband enjoyed spending leisure time together and worked on projects around the house together and her husband fixed breakfast in the morning and would surprise her with date nights. *Id.* The Court concluded that "[t]he fact that there is no mathematical formula whereby compassionately bestowed benefits can be converted into a precise number of bank notes does not mean that the tortfeasor will be excused from making suitable reimbursement for their loss." *Id.* (quoting *Spangler v. Helm's New York-Pittsburgh Motor Exp.*, 153 A.2d 490, 492 (Pa. 1959)).

Here, unlike in *McMichael*, Appellants are asking us to overturn a verdict where the jury placed a value on the non-economic harm caused by Sharon's death. The conclusion in *McMichael* that upheld the award of zero damages for economic harm, as the wife did not present sufficient evidence of such harm, is inapposite. Here, the damages were non-economic, and such damages "cannot be converted into a precise number of bank notes." *Id.*

Further, Appellants' claim that verdict cannot stand because the court instructed the jury that damages must be based on pecuniary value of lost

services is misleading. The court provided an instruction on damages, informing the jury damages could be based on the value of lost services, as well as loss of society and comfort.[18] Contrary to Appellants' claim, the jury instructions did not require damages to be based on the pecuniary value of lost services. Rather that was merely one example of the types of damages available for Wrongful Death claims. Here, the trial court found the evidence and testimony supported the damages for non-economic loss, such as loss of society and comfort. Trial Ct.  Op., filed Dec. 28, 2018, at 5 (finding "[t]he wrongful death claim award does not shock the conscience of the Court and is supported by the weight of the evidence").

We decline to compare this verdict to other Wrongful Death verdicts. As noted above, "we entrust jurors, as impartial acting voice of the community,

_____

[18] The court provided the following instruction on damages for the Wrongful Death Act claim:

> And on the claim under the [W]rongful [D]eath [A]ct, which is the claim that Mr. Kimble is making on behalf of himself, he is entitled to be compensated for past and future noneconomic damages. In other words, when I say noneconomic damages, there aren't claims being made for loss of wages or for medical bills or that sort of thing. Robert Kimble would be entitled to be awarded a sum that would fairly and adequately compensate him for the monetary value of the services, society, and comfort that he would have been given had his spouse, Sharon Kimble, lived, including such elements as work around the home, provision of physical comforts and services, and provision of society and comfort. Those damages are to be awarded in a lump sum if you find the negligence of the defendants and factual cause of the harm claimed.

N.T., 3/28/18, at 77-78.

to quantify noneconomic loss and compensation." **Hammons**, 190 A.3d at 1286. We decline to overturn this jury's voice based on verdicts from other jurors, who heard different cases based on different evidence and different testimony.

Here, the jury, as factfinder, determined the award amount and the trial court, who was present for trial, determined it was not against the weight of the evidence. Our jurisprudence has long emphasized that observing the testimony at trial and determining how much a relationship is worth to survivors is a determination best suited for the collective life experience and impartial community viewpoint of a jury. **See Carlino**, 208 A.3d at 118-19; **Martin**, 466 A.2d at 1025. This is the precise role the jury has fulfilled in this case. We therefore decline to disturb the trial court's decision to deny Appellants' request for a new trial or remittitur. We affirm the judgment.

Judgment affirmed.

President Judge Panella, Judge Lazarus, Judge Stabile, Judge Dubow, Judge Nichols, Judge Murray and Judge King join the opinion.

President Judge Emeritus Bender files a concurring and dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/21

- 36 -