J-E01007-21

2021 PA Super 196

| | | |
|---|---|---|
| ROBERT KIMBLE, ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF SHARON KIMBLE AND ROBERT KIMBLE IN HIS OWN RIGHT | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 617 EDA 2019 |
| LASER SPINE INSTITUTE, LLC, LASER SPINE INSTITUTE PHILADELPHIA, LASER SPINE INSTITUTE OF PENNSYLVANIA, LLC, GLENN RUBENSTEIN, M.D., | : : : : : : : : | |
| APPEAL OF: LASER SPINE INSTITUTE, LLC, | : : | |

Appeal from the Judgment Entered January 17, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 16-00569

| | | |
|---|---|---|
| ROBERT KIMBLE, ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF SHARON KIMBLE AND ROBERT KIMBLE IN HIS OWN RIGHT | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 618 EDA 2019 |
| LASER SPINE INSTITUTE, LLC, LASER SPINE INSTITUTE PHILADELPHIA, LASER SPINE INSTITUTE OF PENNSYLVANIA, LLC, GLENN RUBENSTEIN, M.D., | : : : : : : : : : | |

J-E01007-21

APPEAL OF: GLENN RUBENSTEIN,        :
M.D.,

Appeal from the Judgment Entered January 17, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 16-00569


BEFORE:   PANELLA, P.J., BENDER, P.J.E., LAZARUS, J., STABILE, J.,
          DUBOW, J., NICHOLS, J., MURRAY, J., McLAUGHLIN, J., and KING,
          J.

CONCURRING AND DISSENTING OPINION BY BENDER, P.J.E.:

Filed: September 30, 2021

I concur with the Majority that the LSI Defendants waived any challenge to the way the verdict slip identified them and that, even if that issue were properly preserved, the judgment against them would not be void due to the verdict slip's use of their trade name. I also concur that Appellants waived their arguments for JNOV by not preserving them below, and I agree that — by approving the verdict slip — they waived their claim that the jury improperly apportioned liability between LSI and Dr. Rubenstein. Finally, I support the Majority's determination that the trial court did not abuse its discretion in excluding documentation of the 2011 PFA order and divorce decree — as neither of these documents met the requirements of Pa.R.E. 902 or the Pennsylvania Uniform Interstate and Internal Procedure Act, 42 Pa.C.S. § 5328(a) — and in limiting Appellants' cross-examination of Kimble.

However, I respectfully dissent from the Majority's determination that the $10 million wrongful death verdict was not so excessive as to warrant a new trial. At the outset, I recognize that our standard of review for such

- 2 -

claims gives great deference to the trial court. **Botek v. Mine Safety Appliance Corp.**, 611 A.2d 1174, 1176 (Pa. 1992) ("We have held on numerous occasions that whether to grant a new trial because of excessiveness or inadequacy of the verdict is a matter within the sound and peculiar discretion of the trial court, which has observed the demeanor of the witnesses, and its decision will be sustained by an appellate court in the absence of a clear or gross abuse of discretion or error of law which controlled the verdict or the outcome of the case.") (citations omitted); **see also Bailets v. Pennsylvania Turnpike Commission**, 181 A.3d 324, 336 (Pa. 2018) (same). Notwithstanding this deference, I believe that the trial court grossly abused its discretion in determining that the $10 million wrongful death verdict was not excessive for three primary reasons.

First, I do not believe the trial court adequately considered the evidence relating to non-economic damages when ruling on Appellants' request for a new trial. While the Majority claims that "the trial court aptly assessed the ample evidence supporting the jury's award[,]" **see** Majority Op. at 32, the record belies this assertion. In ruling on Appellants' request, the trial court stated:

> The wrongful death claim award does not shock the conscience of the [c]ourt and is supported by the weight of the evidence. The evidence of record clearly is sufficient to support the jury's wrongful death verdict. How much is a marital relationship worth to a surviving spouse? We leave that determination to the wisdom of a jury. To compare verdicts of other juries/fact finders in order to determine an appropriate award herein strikes at the independence of the jury process. To rule otherwise would permit other juries, hearing other evidence about other marriages, to

- 3 -

create a "data bank" of acceptable ranges of compensation for the loss of a spouse.

Trial Court Order, 12/28/18, at n.2 (internal case citations omitted). Contrary to the Majority's characterization, nowhere in its rationale does the trial court assess any of the evidence adduced at trial nor does it explain why such evidence supports the jury's $10 million award. Given this rather vague, generalized analysis, I struggle to place much weight on the trial court's evaluation of this issue, and I agree with Dr. Rubenstein's observation that "the court's complete deference to the jury abdicated its own duty to evaluate whether the verdict was supported by the evidence or was excessive." Dr. Rubenstein's Brief at 60 (citation omitted).

Second, my own review of the record shows that Kimble presented scant evidence at trial pertaining to non-economic damages, let alone $10 million worth. *See Spangler v. Helm's New York-Pittsburgh Motor Exp.*, 153 A.2d 490, 493 (Pa. 1959) ("While a [t]rial [j]udge is allowed considerable latitude in the matter of awarding new trials, we have often said that we do not abdicate our right to review the record to determine whether the cancellation of a jury's verdict is warranted under all the circumstances of the case.") (citation omitted). I understand that "things such as companionship, comfort, society, guidance, solace, and protection which go into the vase of family happiness are the things for which a wrongdoer must pay when he shatters the vase." *See McMichael v. McMichael*, 241 A.3d 582, 594 (Pa. 2020) (internal quotation marks, brackets, and citation omitted). Nonetheless, Kimble had the burden of proving these damages, and the record

- 4 -

contains limited evidence regarding the nature of the relationship between Kimble and his wife, or the companionship, comfort, society, guidance, solace, and protection Kimble lost. **See id.** at 588 (noting that the plaintiff has the burden of proving wrongful death damages).

At trial, Corey Kimble — Kimble's son — mainly testified about his father's grief, but not about Kimble and Sharon's relationship. Corey did not even know about Kimble and Sharon's 2012 divorce until this litigation began, N.T. Trial, 3/22/18, at 26, 28-29, and he noted that he did not see them a lot during 2010, 2011, and 2012, because he was in college and working full-time. **Id.** at 28. Corey also explained that, because of Sharon's back pain, she "couldn't do a lot of daily tasks. A lot of things fell on my dad's lap." **Id.** at 27.

Kimble also provided very little insight into his relationship with Sharon at trial. He testified that he and Sharon first got married in June of 2003, **id.** at 35, and he said that in 2013, the year before Sharon passed away, he "didn't think [the relationship] was bad, we were pretty good, it wasn't bad. We didn't have too many up and downs. It would probably be the best that could be expected. Like I say, we had our ups and downs, but we just blow that in the wind." **Id.** at 60. When asked about what types of things he and his wife did together, he described that they would "go to visit the grandkids, because she loved the grandkids, and she's always playing with them when we go over to see them. And then we go over [to] our friends. Like I said, we were in a band, we go over [to] our friends and we jam a little bit and sing

and stuff. That's what we enjoyed." *Id.* at 61. Kimble shared that his wife had a pretty singing voice and reflected, "I just miss being with her. That was my baby doll. I'm not going to find anybody else like her. And I'm really not interested in trying to find anybody. That was it." *Id.* at 61-62. Further, after Sharon's death, Kimble testified that he moved in with his mother because he does not "want to be out on my own [right now]. And, plus, it helps [my mother] out, you know, because she can't go up and down stairs and stuff like that, so I do all the laundry and stuff for her...." *Id.* at 33.

However, on cross-examination, Kimble acknowledged that, at the time of his wife's death, there was a protection from abuse order still in effect against him. *Id.* at 69. He also admitted that he and Sharon had gotten divorced in early 2012, and said that he "[doesn't] know why she filed for divorce" and that he "didn't even know she filed for divorce" until after the fact. *Id.* at 72; *see also id.* at 70, 75, 76, 77. He also confirmed that, in November of 2011, Sharon had moved in with her mother. *Id.* at 73.

While Kimble may deserve some non-economic damages for the tragic loss of his wife, the $10 million verdict is excessive and shocks the conscience given the record before us. *See Bailets*, 181 A.3d at 336 ("The assessment of damages is peculiarly within the province of the fact[-]finder and an award will not be upset on appeal unless it is so excessive as to shock the conscience of the court or it is clearly based on partiality, prejudice or passion.") (citation omitted). The meager evidence of the companionship, comfort, society, guidance, solace, and protection Sharon provided to Kimble — in addition to

the evidence of their marital discord and Kimble's purported lack of knowledge of why she divorced him — does not compute to anywhere near a $10 million verdict to me. The Majority focuses on Kimble's profound grief after Sharon's death to justify the award, but it ignores this scarcity of evidence about the nature and quality of their relationship when Sharon was alive.

Finally, I disagree with the trial court and the Majority that we should not consider the amounts of other wrongful death verdicts for loss of society and comfort in conducting our review. I acknowledge the Majority's concern that other juries heard different cases based on different evidence and different testimony. *See* Majority Op. at 36. At the same time, though, to gauge if a wrongful death verdict for loss of society and comfort is excessive, it is sensical to compare it with other such awards and the facts of those cases, and this Court has considered such information in the past in affirming awards. *See Tong-Summerford v. Abington Mem. Hosp.*, 190 A.3d 631, 652 (Pa. Super. 2018) (crediting the trial court's observation that "[t]he jury's award of $1.5 million is consistent with other Pennsylvania verdicts for wrongful death claims"). I also note that the awards in other cases would not be binding upon us, as the trial court seems to fear, but instead would merely serve as guideposts for what a usual or proper award looks like for the loss of the society and comfort of a loved one. *See Spangler*, 153 A.2d at 494 ("While a view of other cases, of course, is always helpful, the amounts cited can very rarely be authoritative of what the verdict should be in a present case since so many shifting economic factors enter into each controversy.").

Looking to other cases, it is clear that Kimble's $10 million award far exceeds other wrongful death awards for loss of society and comfort. *See Tong-Summerford*, 190 A.3d at 650-54 (affirming $1.5 million wrongful death award to daughter after the death of her 88-year-old father who provided emotional support and permitted his grandchildren to live with him while they attended school); *Hatwood v. Hospital of the University of Pennsylvania*, 55 A.3d 1229 (Pa. Super. 2012) (affirming $1.5 million wrongful death award to parents after the death of their 17-month-old child); *Rettger v. UPMC Shadyside*, 991 A.2d 915 (Pa. Super. 2010) (affirming $2.5 million wrongful death award to parents following the death of their 24-year-old son). In comparison, the wrongful death award for loss of society and comfort in the case *sub judice* is roughly four-to-seven times higher than the awards given in other cases for loss of society and comfort. As I set forth *supra*, I do not believe the circumstances in this case warrant such a large verdict.

Accordingly, for these reasons, I conclude that this award is excessive and shocking to the conscience. Consequently, I would affirm Appellants' liability to Kimble, but vacate the judgment and remand for a new trial limited to the issue of damages.